**CHIRON CORPORATION, Plaintiff,**

**v.**

**GENENTECH, INC., Defendant.**

**No. CIV.S–00–1252 WBS GG.**

United States District Court,
E.D. California.

June 24, 2002.

See also 2002 WL 32123930.

Paul Joseph Riley, Morrison and Foerster LLP, San Francisco, CA, Eric S. Walters, Morrison and Foerster, Palo Alto, CA, for Plaintiff.

Jack Vivian Lovell, Hunter Richey DiBenedetto and Eisenbeis, Sacramento, CA, James M. Emery, Michael David Celio, Keker and Van Nest, San Francisco, CA, for Defendant.

James M. Emery, Keker and Van Nest, Henry C. Bunsow, Howrey Simon Arnold and White, San Francisco, CA, for Counter-Claimant.

Rachel Krevans, Morrison and Foerster LLP, San Francisco, CA, for Counter-Defendant.

## MEMORANDUM AND ORDER RE: INVENTORSHIP, OBVIOUSNESS, INEQUITABLE CONDUCT

SHUBB, District Judge.

In a separate order, the court has determined that Genentech's product, Herceptin, infringes Chiron's U.S. Patent No. 6,054,561 (" '561 patent"). Genentech has asserted a number of defenses and counterclaims, three of which—invalidity for failure to join a co-inventor of the patent, invalidity for obviousness, and inequitable conduct—concern the late Dr. Jorgen Fogh's contribution to the invention claimed in the '561 patent. Chiron and Genentech now bring cross motions for summary judgment on these defenses and counterclaims.

### I. Factual Background

The invention claimed in the '561 patent is a genus of monoclonal antibodies that

bind to a human breast cancer antigen known as HER2. The '561 patent issued in April of 2000 from a long line of patents and patent applications dating back to 1984 and 1985, when scientists at Cetus (Chiron's predecessor) first discovered anti-HER2 monoclonal antibodies. The '561 patent attributes these discoveries to two Cetus scientists, Dr. David Ring and Dr. Arthur Frankel.

In the early 1980s, Drs. Ring and Frankel began a program to develop monoclonal antibodies against human breast cancer. Drs. Ring and Frankel obtained a number of immunogens, or substances that are capable of provoking an immune response, which they injected into mice to induce the production of antibodies. ('561 Patent, at 15:53–65.) They then harvested the spleens of the mice and isolated the spleen cells, which produce antibodies. Using techniques developed by Drs. Kohler and Millstein, they then combined those cells with tumor cells to create hybridomas. (Id. at 16:1–18.) The hybridomas produced antibodies, which Drs. Ring and Frankel ran through a series of immunoassays and staining tests to determine their binding properties. (Id. at 16–25.) Using these screening methods, Drs. Ring and Frankel hoped to isolate monoclonal antibodies capable of binding strongly and specifically to human breast cancer tissue but not to normal tissue.

One problem the Cetus scientists encountered was locating a suitable immunogen. Drs. Ring and Frankel had planned from the beginning to use a broad range of immunogens, including both breast cancer tissues and cell lines. (Ring Dep. at 374–75.) The idea was that by using a diversity of immunogens, they would develop a wider range of antibodies capable of binding to breast tumors. (Id.) However, after nearly a year of testing, Dr. Frankel became concerned that many of the monoclonal antibodies they had generated were binding the same group of antigens. (Frankel Decl. ¶ 7.) In addition, although Cetus scientists had used several tissue samples and two cell lines (MCF–7 and ZR–75–1) as immunogens, they had been unsuccessful in producing any antibodies having the desired binding properties. (Id. ¶¶ 6, 7; Frankel Dep. at 50; Taylor Decl. Ex. A.)

"Desperate" to develop monoclonal antibodies against breast cancer, Dr. Frankel consulted Dr. Jorgen Fogh in the late spring or early summer of 1983 for advice on cell lines.[1] (Frankel Dep. at 34, 36.) Dr. Fogh maintained a collection of breast cancer cell lines at the Memorial Sloan Kettering Cancer Center in New York, and Dr. Frankel "felt he was the best person in the world to understand them." (Id. at 35.) Dr. Frankel explained the monoclonal antibody project to Dr. Fogh, as well as the difficulties the Cetus scientists had encountered in identifying an appropriate immunogen to use in their experiments. (Id. at 34, 36.) Dr. Frankel also told Dr. Fogh that he was concerned with using cell lines, which are far removed from patients, as a source for identifying antigens that would be related to real patient's tumors. (Id. at 36.)

Although Dr. Frankel understood the dogma at the time to be that the MCF–7 cell line was the most appropriate cell line to use as an immunogen, Dr. Fogh "insisted" that Dr. Frankel use a breast cancer

---

1.  Dr. Frankel initially estimated that his conversation with Dr. Fogh took place in 1981 or 1982. (Frankel Dep. at 34–37.) After reviewing some dated documents, however, he testified that his meeting with Dr. Fogh took place in approximately July of 1983 (Id. at 99, 102.) The parties do not dispute that the meeting took place in the late spring or early summer of 1983.

cell line known as SKBr–3, and provided Dr. Frankel with an SKBr–3 cell line.[2] (*Id.* at 34, 36, 49.) Dr. Fogh told Dr. Frankel that SKBr–3 had the characteristics Dr. Frankel was looking for in an immunogen, namely that it was different from the other cell lines Dr. Frankel had been using, and that it had a morphology similar to cells of primary breast cancer tumors. (Frankel Decl. at ¶¶ 8,9.) Other than that, Dr. Frankel cannot explain why Dr. Fogh was so insistent that he use SKBr–3. (*Id.*) Dr. Fogh died not long after their meeting. (*Id.*)

After Dr. Frankel's conversation with Dr. Fogh, the Cetus scientists used SKBr–3 as an immunogen. (*Id.* at 103, 107–108, 111.) The first fusion involving SKBr–3 yielded a much higher frequency of selective antibodies, and ultimately produced the first monoclonal antibodies capable of binding to the HER2 antigen. One of those antibodies was monoclonal antibody 454 C11, which is referenced in the claims of the '561 patent. (Frankel Dep. at 49, 218–19; Frankel Decl. ¶ 10; '561 Patent, Claim 1 ("A monoclonal antibody that binds to a human breast cancer antigen that is also bound by monoclonal antibody 454 C11. . . .").)

SKBr–3 had been available to the public since 1972, and its use in cancer research had been published in trade journals prior to the meeting between Drs. Frankel and Fogh. (Van Note Decl. ¶ 12; Crotty Decl. Ex. 7–10.) It is undisputed that in 1983, SKBr–3 was commonly known to persons in the field. (Lanier Dep. at 156–58.) By the time Dr. Fogh and Dr. Frankel met, scientists at Cetus had already obtained SKBr–3 for use in the monoclonal antibody project,[3] although SKBr–3 was initially used only to test for cross-reactivity and not as an immunogen. (Frankel Dep. at 48, 49, 112–114.) Dr. Frankel cannot say conclusively whether he intended to immunize mice with SKBr–3 prior to his conversation with Dr. Fogh, but he believes it is likely that he intended to do so because he "was going to go through eventually as many of the cell lines as [he] could." (*Id.* at 104, 115, 122.)

It is undisputed that in the course of the project, Dr. Frankel contacted numerous scientists who originated or possessed breast cancer cell lines to learn more about the characteristics of the cell lines and to obtain additional samples for the project. (Frankel Decl. ¶ 7.) Dr. Frankel states in his declaration that it was not uncommon for these scientists to suggest that he work with their cell lines and provide him with samples. (*Id.*) Ultimately, Cetus generated monoclonal antibodies capable of bind-

---

**2.** "SKBr–3" stands for Sloan–Kettering Breast Cancer Cell Line Number 3 (Lanier Dep. at 155.)

**3.** Genentech disputes that Cetus possessed SKBr–3 before Dr. Frankel spoke with Dr. Fogh, citing Dr. Frankel's deposition testimony that "what I can't tell you is are those the same cells that I saw with Dr. Fogh." (Frankel Dep. at 112.) Read in context, however, this statement does not create a disputed issue of fact:

> Q: "So you had SKBr–3 cells in the laboratory as of April 1983?
> A: *Yes; that's correct.* What I can't tell you is are those the same cells that I saw with Dr. Fogh. What happened a lot of

people believe they have earlier passage cells if they originated a cell line or he may have told 'use the ones you already have.' I don't remember."

(*See id.* at 112–113.) (emphasis added). Rather than raising a disputed issue of fact, this uncontroverted testimony makes clear that Cetus had obtained SKBr3 prior to Dr. Frankel's meeting with Dr. Fogh. Dr. Frankel was simply testifying that he could not remember whether the cells actually used to produce the first monoclonal antibodies of the invention came from the SKBr–3 cell line already in Cetus's possession, or whether they came from the SKBr–3 cell line Dr. Fogh gave Dr. Frankel at their meeting.

ing to HER2 using at least three different immunogens: the SKBr-3 cell line, the ZR–75–30 cell line, and membrane extracts of a human breast cancer tissue. (Crotty Decl. Ex. 12.)

The '561 patent does not name Dr. Fogh as a co-inventor of the patented invention. However, the '561 patent and every application leading up to the '561 patent states that "[h]uman breast cancer cell lines were obtained from the Breast Cancer Task Force, the American Type Culture Collection (ATCC), and from Dr. Jorgen Fogh at Memorial Sloan Kettering. The cells were maintained and passaged as recommended by the Breast Cancer Task Force, the ATCC and Dr. Fogh." ('561 Patent at 15:56–61.) Both Dr. Frankel and Dr. Ring have submitted declarations attesting that they do not consider Dr. Fogh to be a co-inventor, and that his contribution is accurately described as providing cell lines. (*Id.*)

## II. *Discussion*

The court must grant summary judgment to a moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party adverse to a motion for summary judgment may not simply deny generally the pleadings of the movant; the adverse party must designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Simply put, "a summary judgment motion cannot be

defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989). The non-moving party must show more than a mere "metaphysical doubt" as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In addition, "the inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party seeking to invalidate a patent for failure to name an inventor or for obviousness bears the burden of proving invalidity by clear and convincing evidence. *See Acromed Corp. v. Sofamor Danek Group, Inc.,* 253 F.3d 1371, 1379 (Fed.Cir.2001); *Al–Site Corp. v. VSI Int'l, Inc.,* 174 F.3d 1308, 1323 (Fed.Cir.1999). Clear and convincing proof is also required before a court can find that a patent is unenforceable due to the patentee's inequitable conduct. *Braun, Inc. v. Dynamics Corp. of America,* 975 F.2d 815, 822 (Fed. Cir.1992). The court must take these standards into account in ruling on this motion.

### A. *Inventorship*

■ A patent must list all the inventors of the claimed invention. *See* 35 U.S.C. § 102(f) ("A person shall be entitled to a patent unless . . . he did not himself invent the subject matter to be patented.") Failure to do so invalidates the patent if the omission of an inventor is not corrected.[4] *Solomon v. Kimberly–Clark Corp.,*

---

4. If the error in omitting an inventor was without deceptive intent, the error may be corrected under the "savings provision" of 35 U.S.C. § 256. *Pannu v. Iolab Corp.,* 155 F.3d 1344, 1349 (Fed.Cir.1998). If incorrect inventorship is found, the patentee may invoke section 256, and must be given an opportunity to correct the disclosure of the inventor. If inventorship is corrected, then the patent is not invalid. *Id.*

216 F.3d 1372, 1381 (Fed.Cir.2000); *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349 (Fed.Cir.1998). Inventorship is a question of law, applied to the relevant facts. *See C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1352 (Fed.Cir.1998).

"Because 'conception is the touchstone of inventorship,' each joint inventor must generally contribute to the conception of the invention." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed.Cir. 1998) (citation omitted). Conception is the formation in the mind of the inventor of a "definite and permanent" idea of the complete and operative invention. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed.Cir.1986); *Burroughs v. Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223 (Fed.Cir.1994) (conception occurs when one has "a specific, settled idea, a particular solution to the problem"). An idea is definite and permanent when it can be reduced to practice using reasonable skill. *Id.* Thus, "[o]ne who simply provides the inventor with well-known principles or explains the state of the art without ever having a 'firm and definite idea' of the claimed combination as a whole does not qualify as a joint inventor." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed.Cir.1998).

■ To determine whether a putative joint inventor made a contribution to the conception of the invention, the court must first determine what the contribution was and then determine whether the contribution's role appears in the claimed invention. *Ethicon*, 135 F.3d at 1461. If the putative inventor "(1) contribute(s) in some significant manner to the conception or reduction to practice of the invention, (2) make(s) a contribution to the claimed in-

vention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do(es) more than merely explain to the real inventors well-known concepts and/or the current state of the art," then he qualifies as a joint inventor. *Pannu*, 155 F.3d at 1351.

■ Dr. Fogh's contribution was to suggest the use of SKBr–3 as an immunogen, which led to the production of a monoclonal antibody that falls within the scope of the claims of the '561 patent. However, Dr. Fogh's contribution itself is found nowhere in the claimed subject matter of the invention. Importantly, the '561 patent does not claim a method for making monoclonal antibodies using the SKBr–3 cell line as an immunogen; the '561 patent claims monoclonal antibodies that bind to the HER2 antigen.[5] *Compare Ethicon*, 135 F.3d at 1461 (affirming district court's finding of co-inventorship where co-inventor conceived of locating a blunt probe within the shaft of a surgical instrument, and the patent claim required the shaft to be "longitudinally accommodatable within [the] outer sleeve"). While Dr. Fogh's suggestion led to the production of the first monoclonal antibodies that bound to HER2, Dr. Fogh does not qualify as a joint inventor simply because he contributed to reducing the invention to practice. His contribution must also have been both inventive and significant to what was eventually claimed. *Pannu*, 155 F.3d at 1351.

Measured against the dimension of the *claimed* invention—monoclonal antibodies against HER2—Dr. Fogh's suggestion to use SKBr–3 is much less significant than Genentech suggests. Genentech's conten-

---

**5.** Some of the claims of the '561 patent contain a limitation requiring the antibodies to bind to the SKBr–3 cell line. However, Dr. Fogh did not suggest testing for binding to SKBr–3, and it is undisputed that the named inventors had decided to test their monoclonal antibodies for binding to SKBr–3 by April of 1983, prior to Dr. Frankel's meeting with Dr. Fogh. (Frankel Decl. Ex. B.)

tion that "[w]ithout Dr. Fogh's idea, Chiron would not have used SKBr–3 in a hybridoma to produce antibodies" exaggerates the evidence in the record. (Genentech Mot. Re: Non-joinder of the Inventor, at 5.) Although Dr. Frankel testified that he had reservations about using cell lines, he also testified that he likely would have used the SKBr–3 cell line eventually, because he "was going to go through ... as many of the cell lines as [he] could." Moreover, even without the benefit of Dr. Fogh's advice, Cetus would have produced a monoclonal antibody against HER2, because it succeeded in doing so using immunogens other than SKBr–3. SKBr–3 was not critical to making what was claimed. It is also undisputed that Dr. Fogh did not assist Drs. Ring and Frankel in designing the experiment, determining how to screen the antibodies for the desired characteristics, or in doing any of the laboratory work.

More importantly, it is by no means clear that in recommending the use of SKBr–3 as an immunogen, Dr. Fogh had a "firm and definite idea" of monoclonal antibodies that would bind to HER2. *Ethicon*, 135 F.3d at 1461. Rather than providing inventive input, Dr. Fogh appears simply to have explained the state of the art in cell lines and enthusiastically suggested a possible material to use in the experiment. *See Ethicon*, 135 F.3d 1456.

The SKBr–3 cell line had been publicly available for ten years at the time of Dr. Fogh's conversation with Dr. Frankel, had been described in the literature and used in cancer research, and had already been acquired by Cetus for use in the monoclonal antibody program. One who merely supplies publicly available materials to inventors and explains how those materials can be used in connection with an experiment is not an inventor. *Hess v. Advanced Cardiovascular Sys.*, 106 F.3d 976 (Fed.Cir.1997); *see also Ethicon*, 135 F.3d

at 1460 ("[A]n inventor may use the services, ideas, and aid of others in the process of perfecting his invention without losing his rights to a patent") (internal quotations and citations omitted).

In *Hess v. Advanced Cardiovascular Sys.*, 106 F.3d 976 (Fed.Cir.1997), for example, the invention claimed a catheter for use in angioplasty that had a balloon mounted on a shaft. The named inventors had some initial difficulty finding a suitable material to use in making the balloon. After several failed attempts, they consulted an engineer named Hess, who worked for a company called Raychem. The inventors explained what they were attempting to do and the problems they had encountered. Hess recommended a Raychem product that he believed would work, showed them how a balloon could be formed, and offered other suggestions as to how to make the catheter. Although the inventors followed some of Hess's suggestions and used the material he gave them to make their first working product, the Federal Circuit found that Hess's contribution "did not constitute the conception necessary to establish co-inventorship." *Id.* at 981.

> ... Mr. Hess was "doing nothing more than explaining to the inventors what the then state of the art was and supplying a product to them for use in their invention. ... [M]ost if not all of his discussion with them were [sic] telling them what was available in the marketplace by way of product, and telling them how the product worked." ... The principles Mr. Hess explained to them were well known and found in textbooks. Mr. Hess did no more than a skilled salesman would do in explaining how his employer's product could be used to meet a customer's requirements. The extensive research and development

work that produced the catheter was done by Drs. Simpson and Robert. *Id.* at 980.

Similarly, in this case the named inventors consulted Dr. Fogh after having little success identifying a suitable material for use in their experiment, and explained to him the difficulties they had encountered and the objectives of the experiment. Like Hess, Dr. Fogh provided the named inventors with a material that was available on the market, explained that it had the characteristics they were looking for, and suggested that the material would be suitable to use in a pre-existing experiment. Also as in *Hess,* Dr. Fogh's suggestion led to the first working embodiment of the invention.

Genentech attempts to distinguish *Hess* on the ground that Dr. Fogh's direction to use SKBr–3 as an immunogen cannot be found in any printed publication in 1983, whereas the principles that Hess discussed could be found in textbooks. However, there is no suggestion in *Hess* that any of those textbooks recommended applying the principles described therein to balloon catheters. Similarly, in this case, SKBr–3 had already been described and characterized in the literature by 1983, but none of these publications had suggested its use as an immunogen. Thus, the distinction Genentech points to is really no distinction at all.

Genentech also argues that this case is different from *Hess* because in *Hess,* the inventors had fully conceived of the invention *before* receiving input from Hess, while in this case, Drs. Ring and Frankel had only a general research plan until they spoke with Dr. Fogh. It is true that a general research plan is not firm or definite enough to qualify as a "conception" of the invention. *Burroughs Wellcome,* 40 F.3d at 1228 ("An idea is definite and permanent when the inventor has a specific, settled idea, not just a general goal or research plan he hopes to pursue.") However, even if Drs. Ring and Frankel had not fully conceived of their invention before speaking with Dr. Fogh, it does not necessarily follow that *Dr. Fogh* conceived of the invention.

Genentech argues that Dr. Fogh conceived of the invention because he supplied Drs. Ring and Frankel with an operative mode for making their invention and the necessary insight to make it work. *See Oka v. Youssefyeh,* 849 F.2d 581 (Fed.Cir. 1988) ("Conception requires (1) the idea of the structure of the chemical compound, and (2) possession of an operative method of making it.") The evidence that Dr. Fogh had and offered this kind of "insight," however, is insubstantial. As discussed above, Dr. Fogh supplied the inventors with a material they likely planned to use and already had. Dr. Fogh never explained his reasons for suggesting SKBr–3, and there is no evidence that Dr. Fogh had any experience in immunology or in making monoclonal antibodies. It is therefore unlikely that when Dr. Fogh suggested the use of SKBr–3 as an immunogen, he had solved in his own mind the problem of how to make monoclonal antibodies against human breast cancer.

Genentech also argues that Dr. Fogh's contribution was inventive because Dr. Frankel was initially reluctant to use cell lines, and understood the dogma at the time to be that MCF–7 was the most appropriate cell line to use. However, the record reflects that Dr. Frankel had already tried using MCF–7 to no avail, and that it had occurred to him before speaking with Dr. Fogh that cell lines other than MCF–7 might be appropriate—that is why he sought Dr. Fogh's advice in the first place. The fact that Dr. Fogh was extremely knowledgeable (the "best in the world") in the art of cell lines, and that Dr. Frankel sought Dr. Fogh's advice because

of his expertise does not make Dr. Fogh an inventor. The Supreme Court has long recognized that

> no invention can possibly be made, consisting of a combination of different elements ... without a thorough knowledge of the properties of each of them, and the mode in which they operate on each other. And it can make no difference, in this respect, whether [the inventor] derives his information from books, or from conversation with men skilled in the science. If it were otherwise, no patent, in which a combination of different elements is used, could ever be obtained.

*O'Reilly v. Morse*, 56 U.S. 62, 15 How. 62, 14 L.Ed. 601 (1853). As Chiron aptly puts it, Dr. Frankel's questions for Dr. Fogh "were not blind inquiries, but informed questions by a skilled scientist to which Dr. Fogh, among others, responded. There is no evidence, whatsover that Dr. Fogh—or any of the other scientists contacted by Dr. Frankel—made an inventive contribution when they provided information on cell lines in response to Dr. Frankel's questions." (Chiron Opp'n at 7.)

It simply assumes too much to infer from Dr. Fogh's "insistence" to use SKBr–3 as an immunogen that he conceived of monoclonal antibodies capable of binding in an immunologically significant manner to human breast cancer. Dr. Fogh is no longer alive, and the record appears to be as complete as it will get. There is not enough evidence, let alone clear and convincing evidence, to support a finding that the '561 patent is invalid for failing to mention Dr. Fogh as an inventor. Chiron is therefore entitled to summary judgment on this issue. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (If the defendant bears a clear and convincing burden of proof at trial and presents evidence on summary judgment that "is merely colorable, or is not significantly probative, summary judgment may be granted.")

**B.** *Obviousness*

■ Genentech contends that the conclusion that Dr. Fogh is not a co-inventor leads inevitably to the conclusion that the monoclonal antibodies claimed in the '561 patent are obvious in light of the prior art.

■ A patent is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art ...." 35 U.S.C. § 103. The determination of obviousness is a question of law based on underlying factual considerations, including (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) any "secondary considerations," such as whether the inventor was responding to long felt but unsolved needs, the failures of others, and the commercial success of the invention. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The court must also take care not to enter the "tempting but forbidden zone of hindsight" in analyzing whether an invention would have been obvious. *In re Dembiczak*, 175 F.3d 994 (Fed.Cir.1999).

Genentech contends that if Dr. Fogh is a not co-inventor, the invention claimed in the '561 patent must be obvious in light of (1) a 1975 textbook published by Dr. Fogh describing the characteristics of a number of cell lines including SKBr–3; (2) the method developed by Drs. Kohler and Millstein for producing hybridomas, which was also published in 1975; and (3) a 1982 publication by Michael D. Waterfield, et al. and a 1985 patent for an invention by Dr. Schlom, U.S. Patent 4,612,282, which describe screening procedures, and how to screen for hybridoma-derived monoclonal antibodies that are reactive with human

breast cancer cells.[6] Specifically, Genentech argues that if Dr. Fogh's suggestion to use SKBr–3 to produce an anti-breast cancer antibody was not unique enough to warrant inventorship, then using SKBr–3 as an immunogen to make hybridomas and screening the resulting hybridomas for reactivity with breast cancer must be considered obvious.

Where, as here, the claimed invention is challenged on the grounds that it is obvious in view of a combination of prior art references, "a proper analysis under § 103 requires, *inter alia*, a consideration of two factors: (1) whether the prior art would have suggested to those of ordinary skill in the art that they should make the claimed [product]; and (2) whether the prior art would also have revealed that in so making or carrying out, those of ordinary skill would have a reasonable expectation of success." *In re Vaeck*, 947 F.2d 488 (Fed. Cir.1991). It is insufficient that one skilled in the art might find it "obvious to try" combining the prior references. *In re Geiger*, 815 F.2d 686, 688 (Fed.Cir.1987).

Chiron argues that at most it would have been "obvious to try" to use SKBr–3 as an immunogen in light of the references cited above. "An 'obvious-to-try' situation exists when a general disclosure may pique the scientist's curiosity, such that further investigation might be done as a result of the disclosure, but the disclosure itself does not contain a sufficient teaching of how to obtain the desired result, or that the claimed result would be obtained if certain directions were followed." *In re Eli Lilly & Co.*, 902 F.2d 943, 945 (Fed. Cir.1990).

■ It is undisputed that none of the cited references contain an express suggestion that one or all of them should be used in combination with the other.[7] Moreover, nothing would have suggested to a person of ordinary skill in the art at the time that SKBr–3 would be superior to use as an immunogen in making monoclonal antibodies against human breast cancer. The testimony of Genentech's expert, Dr. Unkeless, is helpful in elucidating this point. At his deposition, Dr. Unkeless explained that the probability of making anti-

**6.** In its interrogatory responses, Genentech stated that its obviousness defense was also based on a combination of (1) Padhy (2) Kohler and Millstein and (3) Schlom or Waterfield. Chiron motion for summary judgment argues that the patent is not obvious in light of these references. Genentech does not oppose Chiron's motion to the extent it relates to the non-obviousness of combining Padhy with Kohler and Millstein and Schlom or Waterfield.

**7.** Although Dr. Fogh verbally suggested that Dr. Frankel use SKBr–3 as an immunogen, his spoken communication does not qualify as "prior art" for purposes of the obviousness analysis. "Unpublished documents or private discussions not of common knowledge do not constitute 'prior art' within the meaning of section 103(a)." *Layne–New York Co. v. Allied Asphalt Co.*, 363 F.Supp. 299, 305 (W.D.Pa. 1973); *Massachusetts Institute of Technology v. AB Fortia*, 774 F.2d 1104, 1109 (Fed.Cir.

1985) (holding that for purposes of analyzing obviousness, the alleged prior art must be a printed publication, i.e. "disseminated or otherwise made available to the extent that persons interested and of ordinary skill in the subject matter or art, exercising reasonable diligence can locate it. . . ."). The only "evidence" that Genentech cites for the proposition that SKBr–3's use as an immunogen was suggested in the literature is a Chiron's brief regarding the question of inventorship. Genentech cites to attorney argument, not to any facts or publications. The court also notes that in concluding that Dr. Fogh was not a co-inventor, the court did not rely on Chiron's representation that SKBr–3's use as an immunogen had been suggested in 1983. The reference cited for that proposition appears to have been a European patent application published on December 9, 1984, which states that "to a lesser extent" SKBr–3 can be used as an immunogen to generate monoclonal antibodies. (Crotty Decl. Ex. 19.)

bodies is proportional to the expression of an antigen on the surface of a tumor cell. (Unkeless Dep. at 131.) The more a cell line expresses an antigen, the more likely it is that one skilled in the art can use that cell line to make monoclonal antibodies. (*Id.*) Importantly, Dr. Unkeless also testified that in the time period between 1983 and 1985, "there was· no knowledge of which cell line over-expressed what." (*Id.*) Later, it was discovered that SKBr–3 over-expresses HER2. However, based on what was known in the art at the time of the invention, there would not have been a "reasonable expectation of success" in creating anti-breast cancer antibodies using SKBr–3 as opposed to some other immunogen. *In re O'Farrell,* 853 F.2d 894, 903–904 (Fed.Cir.1988). SKBr–3 was simply one of many possible immunogens that the inventors experimented with in their attempts to create a monoclonal antibody against human breast cancer.

This case presents a classic situation in which it is obvious to "try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful." *Id.* As the Federal Circuit has held, this does not render a patent "obvious" within the meaning of section 103. *Id.* This conclusion is reinforced by Dr. Unkeless's deposition testimony that it would *not* have been obvious in 1983 to combine the Fogh text with Kohler and Milstein, and Schlom and Waterfield. (Unkeless Dep. at 130–131.)

There is nothing inconsistent in finding that it would have been obvious to try using SKBr–3 as an immunogen and find-ing that Dr. Fogh's suggestion to use SKBr–3 as an immunogen was not inventive. As discussed above, Dr. Fogh does not qualify as an inventor in part because he suggested what was obvious to try.

Finally, Genentech's motion does not address which of the claims in the '561 patent are obvious in light of the asserted prior art references. For example, some of the claims of the '561 patent require strong staining on one or less or three or less non-breast cancer cells and tissues. Genentech has failed to present any evidence that it would have been obvious to combine the cited references to make a monoclonal antibody that meets these limitation. "[A] party challenging the validity of a claim, absent a pretrial agreement or stipulation, must submit evidence supporting a conclusion of invalidity for *each* claim the challenger seeks to destroy." *Ortho Pharm. Corp. v. Smith,* 959 F.2d 936, 942 (Fed.Cir. 1992) (quoting *Shelcore, Inc. v. Durham Indus.,* 745 F.2d 621, 625 (Fed.Cir.1984)) (emphasis added); 35 U.S.C. § 282 ("Each claim of a patent (whether independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims"). Therefore, Chiron is entitled to summary judgment on Genentech's defense that the patent is obvious in light of Fogh, Kohler and Millstein, and Schlom and Waterfield.

### C. *Inequitable Conduct*

Genentech contends that Chiron engaged in inequitable conduct by mischaracterizing and marginalizing Dr. Fogh's contribution when prosecuting the '561 patent. Genentech also faults the lawyers who handled the patent prosecution for not taking further steps to investigate the nature of Dr. Fogh's contribution to the invention.[8]

---

**8.** In its First Amended Answer and Responses to Interrogatories, Chiron alleged a number of other inequitable conduct theories. Chiron moved for summary judgment on all of them. Genentech filed a non-opposition to Chiron's motion with respect to all of these other theories, and stated that it was withdrawing them from the case. Genentech's sole basis for its inequitable conduct defense, therefore, is its allegation that Chiron intentionally misrepre-

■ A patent is unenforceable if, in acquiring the patent, a patent applicant or his or her representative engaged in "inequitable conduct" before the Patent and Trademark Office ("PTO"). Inequitable conduct occurs when a patent applicant (1) affirmatively misrepresents a material fact, fails to disclose material information, or submits false material information to the PTO, and (2) does so with an intent to deceive the PTO. *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1327 (Fed. Cir.1998).

■ Determination of inequitable conduct requires a two step analysis. *Id.* First, the district court must determine whether the withheld reference meets the threshold level of materiality, and whether the evidence shows a threshold level of intent to mislead the PTO. *Id.* Second, the district court is required to weigh materiality and intent. *Id.* "The more material the omission, the less evidence of intent will be required in order to find that inequitable conduct has occurred." *Id.* "In light of all the circumstances, the court must then determine whether the applicant's conduct is so culpable that the patent should be held unenforceable." *Id.; Kingsdown Med. Consultants, Ltd v. Hollister, Inc.*, 863 F.2d 867, 876 (Fed.Cir. 1988). Inequitable conduct is a matter for the court to decide in the exercise of its equitable discretion. *Kingsdown*, 863 F.2d at 876; *General Electro Music Corp. v. Samick Music Corp.*, 19 F.3d 1405, 1408 (Fed.Cir.1994); *Paragon Podiatry Lab., Inc. v. KLM Labs.*, 984 F.2d 1182, 1190 (Fed.Cir.1993).

### 1. *Materiality*

■ Information is material when "it is not cumulative to information already of record or being made of record in the application, and (1)[i]t establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2)[i]t refutes, or is inconsistent with, a position the applicant takes in: (i)[o]pposing an argument of unpatentability relied on by the Office, or (ii)[a]sserting an argument of patentability." 37 C.F.R. § 1.56.[9]

Failure to name a co-inventor invalidates a patent, and therefore "information about inventorship is material under 37 C.F.R. § 1.56." *Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315 (Fed.Cir.2000). The fact that the court has found that Dr. Fogh is not a joint inventor of the patent is not dispositive of Genentech's inequitable conduct defense. Falsehoods and omissions "calculated to 'obfuscate the threshold issue of inventorship'" are sufficient to support an inequitable conduct defense. *Id.* at 1321. "[T]he issue is not inventorship per se, but misinformation about inventorship." *Id.* at 1322.

The '561 patent and every parent application discloses that Dr. Fogh provided cell lines to the named inventors. Genentech argues that this statement is misleading because it implies that Dr. Fogh's role was limited to supplying cell lines, when in reality his contribution was to suggest using SKBr–3 as an immunogen. The court finds nothing misleading in the disclosure in the '561 patent.

---

sented the full scope of Dr. Fogh's contribution.

9. The rule in force when Chiron was prosecuting the parent applications of the '561 patent was somewhat different, requiring "a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1327 (Fed.Cir.1998). As applied to the facts of this case, the old rule does not dictate a different outcome.

2. *Intent*

Even if the '561 patent could be construed as misleading, there is no evidence in the record that anyone involved in prosecuting the '561 patent believed Dr. Fogh to be an inventor of the patent and intentionally obscured his contribution because of that belief. It is undisputed that Dr. Frankel was the only person who was aware of his conversation with Dr. Fogh while the patent was being prosecuted. Dr. Frankel attests in his declaration that he did not consider Dr. Fogh's contribution to be significant enough to qualify him as an inventor. Given the enormous volume of research the named inventors conducted, the time they spent developing their research plan and carrying it out apart from Dr. Frankel's one-time meeting with Dr. Fogh, and the fact that Dr. Fogh's suggestion to use SKBr-3 as a cell line was one among many suggestions the inventors received from other scientists, there is nothing suspicious about Dr. Frankel's statement that he did not believe Dr. Fogh to be a co-inventor.

Genentech has also suggested that the attorneys involved in prosecuting the patent acted with deceptive intent because they failed to investigate Dr. Fogh's contribution. This suggestion does not withstand scrutiny. It is undisputed that Dr. Frankel's discussion with Dr. Fogh was first brought to the attention of these attorneys sometime after September 22, 2001. The '561 patent, however, had issued in April of 2000. These attorneys cannot have intended to deceive the PTO while prosecuting the patent if they were not aware of the relevant facts until after the patent had issued. Moreover, the Manual of Patent Examination and Procedure provides that the duty to disclose information ends when a patent is granted on an application. Manual of Patent Examination and Procedure § 2001.4.

Genentech nevertheless insinuates that Chiron minimized Dr. Fogh's contribution in order to maintain total control over the rights to the '561 patent, and keep Dr. Fogh and Sloan Kettering from gaining a share of the royalties Chiron hoped to recover from Genentech through litigation. However, Chiron's disclosure about the scope of Dr. Fogh's contribution has remained unchanged since the first application was filed in 1984, long before Genentech had developed Herceptin and before any litigation against Genentech was contemplated by Chiron. Moreover, the court finds it difficult to believe that Dr. Frankel, a scientist having no legal training of which the court is aware, and the only person who knew about Dr. Fogh's contribution while the patent was being prosecuted, was concerned with Chiron's litigation strategy. Genentech's argument is not supported by any evidence and amounts to nothing more than speculation. *See Nova Biomedical Corp. v. Mallinckrodt Sensor Sys., Inc.,* 997 F.Supp. 187, 191–92 (D.Mass.1998) (finding that suspicious circumstances were insufficient to support an inequitable conduct defense where defendant had presented only speculation and conjecture regarding patentee's knowledge and intent). Therefore, Chiron is entitled to summary judgment on Genentech's inequitable conduct defense.

IT IS THEREFORE ORDERED that:

(1) Summary judgment on the defense of inventorship be, and the same hereby is, GRANTED to Chiron and DENIED to Genentech;

(2) Summary judgment on the defense of obviousness be, and the same hereby is, GRANTED to Chiron and DENIED to Genentech;

(3) Summary judgment on the defense of inequitable conduct be, and the same hereby is, GRANTED to Chiron.