Jaswant S. PANNU and Jaswant S. Pannu, M.D., Plaintiffs–Cross Appellants,

v.

IOLAB CORPORATION, Defendant–Appellant.

Nos. 97–1466, 97–1501.

United States Court of Appeals, Federal Circuit.

Aug. 6, 1998.

Michael C. Cesarano, Bienstock & Clark, Miami, Florida, argued, for plaintiffs-cross appellants.

Harry J. Roper, Roper & Quigg, Chicago, Illinois, argued, for defendant-appellant. With him on the brief were Raymond N. Nimrod, Aaron A. Barlow, and Sarah L. Taylor.

Before MAYER, Chief Judge, LOURIE and RADER, Circuit Judges.

LOURIE, Circuit Judge.

In this patent infringement case, Iolab Corporation appeals from the decision of the United States District Court for the Southern District of Florida awarding the patentee, Dr. Jaswant S. Pannu, damages and enjoining Iolab from further infringement. *See Pannu v. Iolab Corp.*, 93–CV–6076 (S.D.Fla. Feb. 10, 1997). Because the district court erred in granting Pannu's motion for judgment as a matter of law (JMOL) that Iolab could not invalidate the patent, U.S. Reissue Patent 32,525, on the ground of improper inventorship, we reverse the grant of JMOL, vacate the judgment of infringement, and remand.

Iolab also appeals and Pannu cross-appeals from the denial of their respective renewed motions for JMOL following the jury verdict that two of the four accused devices infringe, while the other two accused devices do not. Iolab asserts that the court's claim construction was erroneous; Pannu asserts that the findings of non-infringement were tainted by a variety of prejudicial errors. Because the

district court did not err in construing the claims, the jury's findings were supported by substantial evidence, and the court did not abuse its discretion in its procedural decisions, we do not disturb the court's denial of the parties' post-trial motions.

### BACKGROUND

The invention of the '525 patent is directed to an improved intraocular plastic lens, which can be inserted into the human eye as a replacement for a failed natural lens. Intraocular plastic lenses are typically used in cataract surgery. Generally, the lenses have a circular optic (or lens body) through which light is focused. The lenses also have positioning and supporting members that project from the rim of the optic. One problem associated with such lenses is that they tended to snag delicate eye tissue during insertion into the eye, a problem caused by the pointed end of the positioning and supporting members.

In April 1980, Pannu filed a patent application directed to an improved posterior intraocular lens that reduced snagging by placing a circular loop at the end of the positioning and supporting members. The application disclosed a lens consisting of an optic made from resins or glass with attached supporting members made from resins, glass, metal, or nylon. Subsequently, in October, Pannu met with Dr. William Link, then president of Heyer–Schulte, a manufacturer of intraocular lenses, to discuss whether Heyer–Schulte would be interested in licensing Pannu's invention. Link suggested that Pannu's lens could be manufactured from a single piece of clear plastic. Following their meeting, Heyer–Schulte manufactured several prototype single-piece lenses which Pannu then successfully implanted in the eyes of his patients.

On May 8, 1981, Pannu filed a continuation-in-part (CIP) application disclosing and claiming a single-piece lens consisting of a lens body [12] and integrally formed supporting members [14] with snag-resistant elements [16] having continuous and smooth curves, as shown below in Figures 1 and 2 of the '525 patent.

FIG. 1        FIG. 2

The CIP application issued as U.S. Patent 4,435,855; it was reissued as the '525 patent in 1987. Two years later, Pannu's attorneys offered Link's company a license under the '525 patent. Link responded that "I suggested to Dr. Pannu we make his lens using a single-piece of [plexiglass]" and evidenced surprise that Pannu was "listed as the sole inventor on this patent in which single-piece technology plays a key role."

Representative claim 1 of the '525 patent reads in pertinent part as follows:

> An intraocular lens comprising:
>> a lens body;
>> at least two spaced flexible positioning and supporting elements integrally formed

with said lens body as a one-piece construction and extending radially, outwardly from the periphery of said lens body;

said elements terminating in a free end spaced from said periphery; and

snag-resistant means integrally formed on the free end of each of said elements for smoothly guiding and positioning the lens across contacted eye tissue when implanting the lens ... said snag resistant elements and said positioning and supporting elements being substantially coplanar.

On January 29, 1993, Pannu sued Iolab, alleging that four types of intraocular lenses manufactured by Iolab infringed the '525 patent. Iolab answered by asserting that the patent was invalid for lack of an enabling description, failure to disclose the best mode, and improper inventorship. Regarding improper inventorship, Iolab argued that the patent was invalid because the '525 patent does not list Link as an inventor. Iolab in fact argued that Link was not only a co-inventor, but the sole inventor, because Pannu, by sending non-confidential letters to lens manufacturers in early 1980, had already placed his contribution to the invention, the snag-resistant loop, in the prior art.

Following a "Markman" hearing, the court construed the terms "snag-resistant means" and "substantially coplanar." Regarding the former limitation, the court determined that the claim recited sufficient structure such that 35 U.S.C. § 112, ¶ 6 (1994) did not apply. The court rejected Iolab's contention that the snag-resistant limitation must prevent any damage to the eye, finding no support for such a construction in the specification or the prosecution history. Instead, the court ruled that the snag-resistant means must be curved so as to minimize snagging, but not necessarily to eliminate it.

Regarding the "substantially coplanar" limitation, Iolab argued that the two supporting elements and the two snag-resistant ele-

ments all had to be within the same plane, relying on its expert's testimony that the limitation "describes a flat lens where the elements may deviate from the plane only as the result of manufacturing tolerances or natural flexibility." In contrast, Pannu argued that the term "substantially coplanar" permitted some small angle to exist between the supporting elements and the snag resistant elements. The court, after considering the prosecution history, including drawings submitted by Pannu showing lenses with angles up to ten degrees, agreed with Pannu and construed the limitation as requiring an angle of no more than ten degrees between the snag-resistant elements and the supporting elements.[1]

Following a trial in January and February 1997, but before the case was submitted to the jury, Pannu successfully moved for JMOL on Iolab's invalidity defense based on improper inventorship. The court found no evidence that Link was, or had ever claimed to be, the sole inventor of the patent. The court also determined that, even assuming that Link was a co-inventor, Iolab would have to establish that Pannu acted in bad faith in failing to name him as an inventor on the patent. Because Iolab had not submitted any evidence suggesting Pannu's bad faith, the court ruled that the patent would be correctable under 35 U.S.C. § 256 (1994) and thus could not be invalidated for improper inventorship.

The jury rendered a verdict finding that the patent was not proved invalid for a failure to disclose the best mode or for lack of enablement. The jury also found that only two of the four accused lenses infringed the claims of the patent and awarded Pannu damages based on a royalty rate of seven percent. All post-trial motions were denied and the court entered final judgment for Pannu, awarding $670,667.47 in damages and enjoining Iolab from manufacturing or selling the adjudged infringing lenses. Iolab ap-

1. The court further construed the limitation as requiring no more than a ten degree angle between any of the four elements and the lens body. We can find no support for this additional constraint. This error, which was not addressed by the parties, does not affect the outcome of this appeal and is thus harmless.

peals from the infringement and validity judgments, and Pannu cross-appeals from the judgment of non-infringement. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (1994).

## DISCUSSION

On appeal from a judgment denying a motion for JMOL, we reapply the standards used by the district court in ruling on the motion. *See Cybor Corp. v. FAS Technologies., Inc.*, 138 F.3d 1448, 1454, 46 U.S.P.Q.2d 1169, 1173 (Fed.Cir.1998) (in banc). A motion for JMOL against a party may be granted at the close of the evidence and before the case is submitted to a jury if the "party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a). To prevail on a renewed motion for JMOL following a jury trial, a party "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893, 221 U.S.P.Q. 669, 673 (Fed.Cir.1984) (citation omitted); *see also* Fed.R.Civ.P. 50(b). We review the denial of a motion for a new trial for an abuse of discretion. *See DMI, Inc. v. Deere & Co.*, 802 F.2d 421, 427, 231 U.S.P.Q. 276, 280 (Fed.Cir.1986).

### A. *Inventorship*

■ Iolab argues that the '525 patent is invalid under 35 U.S.C. § 102(f) (1994) for failure to name Link as an inventor, and that the district court thus erred by granting JMOL in favor of Pannu on Iolab's inventorship defense.[2] Specifically, Iolab argues that

it is undisputed that Link contributed the idea of making Pannu's snag-resistant lens from a single piece of plastic, thus making Link at least a co-inventor of the patented invention. Iolab also argues that Link's contribution in fact makes him the sole inventor because Pannu had already placed his contribution in the prior art. Because of what it calls overwhelming evidence of Link's contribution and nonjoinder, Iolab asserts that the inventorship issue should have gone to the jury. Iolab further asserts that, were the jury to find for Iolab on this issue, the patent would be invalid unless Pannu corrects the inventorship pursuant to 35 U.S.C. § 256 (1994). Iolab further asserts that if inventorship were corrected, the patent would then be invalid for failure to disclose the inventor's best mode of making the claimed one-piece lenses. *See* 35 U.S.C. § 112, ¶1 (1994).

Thus, according to Iolab, the district court erred by requiring the accused infringer to prove by clear and convincing evidence that the patent was uncorrectable under section 256; the court should have placed the burden of going forward under section 256 on the patentee. Pannu responds that the district court correctly placed the burden on Iolab to prove both nonjoinder of an inventor and uncorrectability under section 256.

■ We agree with Iolab that the district court erred by not sending the inventorship issue to the jury. Section 282 lists the defenses available in any action involving the validity or infringement of a patent. Among these are "[i]nvalidity of the patent or any claim in suit on any ground specified in part II of this title as a condition of patentability." 35 U.S.C. § 282, ¶2 (1994). Section 102, which is within Part II of Title 35, is entitled "Conditions for patentability; novelty and loss of right to patent"; section 102(f) provides that "[a] person shall be entitled to a

---

**2.** Iolab also argues that the district court erred in granting JMOL that the patent was not proved invalid as anticipated by the similar work of a competitor under 35 U.S.C. § 102(g). This argument is without merit because no reasonable jury could have found that the competitor's invention was either conceived before or reduced to practice before the invention of the '525 patent. The

Pannu–Link meeting, where the conception necessarily occurred, was held in October 1980, and Pannu implanted prototypes in December of that year. The competitor's conception occurred in November 1980, after Pannu's, and its reduction to practice did not occur prior to 1981, also after Pannu's.

patent unless he did not himself invent the subject matter sought to be patented." Since the word "he" refers to the specific inventive entity named on the patent, *see generally A.F. Stoddard & Co. v. Dann*, 564 F.2d 556, 566–67, 184 U.S.App.D.C. 71, 81–82 (D.C.Cir.1977) (Markey, C.J., sitting by designation); 1 D. Chisum, *Chisum on Patents*, § 2.03[1] (1997), this subsection mandates that a patent accurately list the correct inventors of a claimed invention, *see Schulze v. Green*, 136 F.3d 786, 792, 45 U.S.P.Q.2d 1770, 1774 (Fed.Cir.1998) (permitting a third-party to challenge patentability under § 102(f) based on an assertion of misjoinder); *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1562, 224 U.S.P.Q. 259, 265 (Fed.Cir.1984) (stating that a jury's conclusion of invalidity, based on its specific findings that the sole named inventor had in fact co-invented the claimed design and "deceptively intended not to disclose that coinventorship in its application to the Patent Office ... reflected the bar in 35 U.S.C. § 102(f) against the issue of a patent to an applicant who 'did not himself invent the subject matter sought to be patented' "). Accordingly, if nonjoinder of an actual inventor is proved by clear and convincing evidence, *see Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980, 41 U.S.P.Q.2d 1782, 1785 (Fed. Cir.1997) (stating that " 'the burden of showing misjoinder or nonjoinder of inventors is a heavy one and must be proved by clear and convincing evidence' " (quoting *Garrett Corp. v. United States*, 190 Ct.Cl. 858, 422 F.2d 874, 880, 164 U.S.P.Q. 521, 526 (1970))), *cert. denied*, —— U.S. ——, 117 S.Ct. 2459, 138 L.Ed.2d 216 (1997), a patent is rendered invalid.[3]

Well-established case law predating the enactment of the Patent Act of 1952, Pub.L.

No. 82–593, 66 Stat. 792, mandated that nonjoinder of an actual inventor would render a patent invalid. *See, e.g., Pointer v. Six Wheel Corp.*, 177 F.2d 153, 157, 83 U.S.P.Q. 43, 47 (9th Cir.1949) ("[I]t has been held repeatedly that a valid patent can only be granted to the real inventor, that the original and first inventor must make the application, and that, in the case of a patent which is a joint invention, a patent issued to one only of the inventors is void."); *City of Milwaukee v. Activated Sludge*, 69 F.2d 577, 587 (7th Cir. 1934) ("When a number of persons make an invention jointly, a valid patent can not be taken out in the name of one of them."); *Tin Decorating Co. v. Metal Package Corp.*, 37 F.2d 5, 7 (2d Cir.) ("[T]he patent is for a machine embodying the ideas of at least two or four men, George, Klocke, Schultz, and Gueritey.... [¶] Accordingly, the patent to George as the sole inventor is invalid."); *McKinnon Chain Co. v. American Chain Co.*, 268 F. 353, 360 (3d Cir.1920) ("[T]he invention was the invention of both [Hoff and Coulter], and was, therefore, joint invention. On this finding it follows that the award of the patent to Coulter as the sole inventor was unlawful, and that, in consequence, the patent, as to the claims in suit, is invalid." (citations omitted)); *Smart v. Wright*, 227 F. 84, 87 (8th Cir.1915) ("[T]he machine was the result of the joint thought and action of the two men, Wright and Smart. That being the case, neither of them could secure a valid patent as sole inventor."). Neither the plain language nor the pertinent legislative history of section 102(f) indicates that Congress intended that section to effect a change in existing law. *See* S.Rep. No. 82–1979, at 5 (1952), *reprinted in* 1952 U.S.C.C.A.N. 2394, 2395 ("Subsection (f) merely emphasizes that it is the inventor that applies for the patent."). Thus, section 102(f) still makes the

---

**3.** Various statutory provisions deal with certain situations in which an inventor does not join in the application. *See, e.g.,* 35 U.S.C. § 116 (1994) ("If a joint inventor refuses to join in an application for patent or cannot be found or reached after diligent effort, the application may be made by the other inventor on behalf of himself and the omitted inventor."), 35 U.S.C. § 117 (1994) (entitled "Death or incapacity of inventor"), 35 U.S.C. § 118 (1994) (entitled "Filing by other

than inventor"); *see also* P.J. Federico, *Commentary on the New Patent Act*, 35 U.S.C.A. 1, 19 (1954), *reprinted in* 75 J. Pat. & Trademark Off. Soc'y 163, 180 (1993) ("Since later sections permit certain persons to apply for a patent in place of the inventor under special circumstances, ... paragraph (f) would have to be interpreted in such cases as referring to the person named as an inventor in the application.").

naming of the correct inventor or inventors a condition of patentability; failure to name them renders a patent invalid.

However, in cases of misjoinder and nonjoinder the operation of section 102(f) is ameliorated by section 256. *See MCV, Inc. v. King–Seeley Thermos Co.,* 870 F.2d 1568, 1570, 10 U.S.P.Q.2d 1287, 1289 (Fed.Cir.1989) ("Before the enactment of section 256, patentees and their assignees committed inventorship errors at their peril; misjoinder or nonjoinder of an inventor rendered the patent invalid. Section 256 affords the opportunity to correct the patent."); *see also* S.Rep. No. 82–1979, at 7–8 (1952), *reprinted in* 1952 U.S.C.C.A.N. 2394, 2401–02 ("Very often two or three people make an invention together. They must apply as joint inventors. If they make a mistake in determining who are the true inventors, they do so at their peril. This provision permits a bona fide mistake in joining a person as [an] inventor or in failing to join a person as an inventor to be corrected."); *id.* at 27, *reprinted in* 1952 U.S.C.C.A.N. 2394, 2421 ("This section is new and a companion to section 116.").

■ Section 256 provides that:

Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Commissioner may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Commissioner shall issue a certificate accordingly.

This section is a savings provision. If a patentee demonstrates that inventorship can be corrected as provided for in section 256, a district court must order correction of the patent, thus saving it from being rendered invalid.

■ When a party asserts invalidity under § 102(f) due to nonjoinder, a district court should first determine whether there exists clear and convincing proof that the alleged unnamed inventor was in fact a co-inventor. Upon such a finding of incorrect inventorship, a patentee may invoke section 256 to save the patent from invalidity. Accordingly, the patentee must then be given an opportunity to correct inventorship pursuant to that section. Nonjoinder may be corrected "on notice and hearing of all parties concerned" and upon a showing that the error occurred without any deceptive intent on the part of the unnamed inventor.[4] 35 U.S.C. § 256; *see Stark v. Advanced Magnetics, Inc.,* 119 F.3d 1551, 1555, 43 U.S.P.Q.2d 1321, 1324 (Fed.Cir.1997) ("[T]he section allows addition of an unnamed actual inventor, but this error of nonjoinder cannot betray any deceptive intent by that inventor."); *see also* P.J. Federico, *Commentary on the New Patent Act,* 35 U.S.C.A. 1, 50 (1954), *reprinted in* 75 J. Pat. & Trademark Off. Soc'y 163, 211 (1993) ("[N]onjoinder of joint inventors shall not invalidate a patent if the mistake is one that can be corrected under the [sic., this] section, that is, arose by error and without deceptive intention, and gives a court authority to order correction."). Finally, a patent with improper inventorship does not avoid invalidation simply because it *might* be corrected under section 256. Rather, the patentee must claim entitlement to relief under the statute and the court must give the patentee an opportunity to correct the inventorship. If the inventorship is successfully corrected, section 102(f) will not render the patent invalid. On the other hand, if the patentee does not claim relief under the statute and a party asserting inval-

---

4. While lack of deceptive intent, as a negative, may be hard for a patentee to prove when it claims relief under the statute, good faith is pre-sumed in the absence of a persuasive showing of deceptive intent.

idity proves incorrect inventorship, the court should hold the patent invalid for failure to comply with section 102(f).

■ Applying this statutory framework to the present appeal, we conclude that the district court erred by granting JMOL in favor of Pannu because there exists sufficient evidence for a reasonable jury to find that Link was an actual inventor. Pannu has conceded that he and Link discussed the invention and that Link contributed the idea of one-piece construction for the lens. "Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent." 35 U.S.C. § 116 (1994). All that is required of a joint inventor is that he or she (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art. *See Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473, 43 U.S.P.Q.2d 1935, 1941 (Fed.Cir.1997); *see also Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460, 45 U.S.P.Q.2d 1545, 1548 (Fed.Cir.1998). Thus, based on Pannu's unrebutted testimony, a reasonable jury could find that Link was an inventor. The parties each raise a number of issues regarding the significance of the one-piece construction aspect of the invention. We decline to consider these arguments for the first time on appeal. On remand, Link's inventorship status should be determined, and if Link is found to be a co-inventor, the patentee must be given an opportunity to invoke the benefits of section 256.[5]

■ Iolab not only argues that Link is a co-inventor, but also argues that it submitted evidence that Link was the sole inventor of the patented invention. Iolab asserts that because Pannu placed his contribution in the prior art more than one year before he met with Link in 1980, *see* 35 U.S.C. § 102(b) (1994) ("A person shall be entitled to a patent unless the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."), Pannu cannot even claim the status of joint inventor. Iolab is mistaken. It is undisputed that Pannu and Link collaborated in the development and production of one-piece prototype embodiments of the invention. Link cannot claim the status of a sole inventor simply because Pannu had disclosed his ideas to Link and others more than a year earlier. During the meeting with Link, Pannu was doing more than simply providing Link with well-known principles or explaining the state of the art; he was contributing his ideas concerning the snag-resistant elements to a total inventive concept. Because it is undisputed that the invention was conceived while Link and Pannu were engaged in a collaborative enterprise and it is furthermore undisputed that Pannu conceived significant aspects of the invention, Pannu is certainly at least a co-inventor. *See Ethicon*, 135 F.3d at 1460, 45 U.S.P.Q.2d at 1548 (Fed.Cir.1998) (discussing co-inventorship generally); *cf. Hess*, 106 F.3d at 981, 41 U.S.P.Q.2d at 1787 (finding no co-inventorship where district court did not clearly err in finding that the alleged co-inventor was, *inter alia*, "doing nothing more than explaining to the inventors what the then state of the art was" and "telling them what was available in the marketplace by way of product").

B. *Infringement*

■ Iolab also argues that the district court misconstrued two limitations in the

---

5. If the patent is corrected under section 256, Iolab may of course reassert its defense based on the theory that the proper inventive entity failed to disclose its best mode. This is because the jury's finding on the best mode issue was predicated on Pannu being the sole inventor. Best mode issues can arise if any inventor fails to disclose the best mode known to him or her.

claims, and that under the correct claim construction, infringement is precluded as a matter of law. First, Iolab argues that the claim limitation "substantially coplanar" must refer to "non-vaulted" lenses, which are flat. Iolab asserts that no other interpretation is supported by the specification or the prosecution history. We disagree.

Claim construction is a question of law, which we review *de novo*. *Cybor Corp.*, 138 F.3d at 1454, 46 U.S.P.Q.2d at 1173. When construing a claim, a court principally consults the intrinsic record, consisting of the claims themselves, the written description portion of the specification, and the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582–83, 39 U.S.P.Q.2d 1573, 1576–77 (Fed.Cir.1996). The claim term "coplanar" is modified by the term "substantially." The district court properly examined the specification and prosecution history to determine the meaning of the term "substantially coplanar" and construed the term to cover the two examples submitted to the examiner during prosecution of the patent. We discern no error in the court's construction of this term. Iolab's argument that the specification only discloses flat lenses is plainly incorrect. Regarding one embodiment of the invention, the specification states that the rings "lie in a plane sufficiently close to the plane of the lens." This statement clearly contemplates that the rings and the lens lie in different, although close, planes. Additionally, Iolab has not drawn our attention to any portion of the prosecution history that precludes angles as small as ten degrees from being considered substantially coplanar; nor has it suggested a more appropriate angle. Furthermore, there is no support in the patent or prosecution history for Iolab's proposed claim construction. The patent draws no distinction between vaulted and non-vaulted lens; these terms are not even found in the intrinsic documents.

Iolab next argues that the court misconstrued the term "snag-resistant means ... for *smoothly* guiding and positioning the lens across contacted eye tissue" (emphasis added). Noting that the specification states that "the most important advantage [of the invention] is the provision of a snag-resistant ring which prevents injury to delicate eye tissue during implantation," Iolab asserts that the snag-resistant means must prevent any and all damage to the eye during insertion. We agree with the district court that the patent as a whole belies this interpretation. Most significantly, the claim itself only requires a "snag-resistant means ... for smoothly guiding." Damage prevention is not claimed in any manner. The district court correctly recognized that the function of smoothly guiding is accomplished by the structure recited in the claim itself.

Iolab argues that even accepting the district court's claim construction, Pannu failed to prove that the claims read on any of the accused products. Iolab asserts that no reasonable jury could have found infringement because Pannu submitted no evidence that the lenses found to infringe are "less likely to snag," as required by the court's claim construction, than if those lenses lacked the claimed "snag-resistant means." Pannu responds that he submitted substantial evidence on which the jury could have found infringement. We agree that the denial of Iolab's motion for JMOL of noninfringement was not incorrect. At trial, Pannu introduced evidence that the accused lenses had continuous smooth rounded edges at the ends of the supporting and positioning members and that the function of the rounded edges was for smoothly guiding and positioning the lens. Iolab offered nothing in rebuttal and did not offer a competing explanation of the purpose of the rounded edges.

Finally, Pannu challenges the jury's verdict that the remaining two lenses infringed the patent, asserting that the district court committed prejudicial error. Pannu argues that the district court abused its discretion by denying his request for a new trial. One ground asserted by Pannu is that the jury failed to understand how the angle of the rings and supporting elements should be measured. This argument is without merit. Rather than clearly demonstrating the sup-

posed flaw in the jury's reasoning, Pannu does nothing more than reargue the case to us on appeal. The jury's decision was made in the face of conflicting and contradictory evidence. Each of the jury's alleged "errors" and "misunderstandings" identified by Pannu simply reflects the jury's acceptance of facts adverse to him. For example, one of the accused lenses is bent such that a portion of it is coplanar with the snag-resistant rings and the other portion is not. The jury heard both Pannu's and Iolab's arguments and decided that this lens lacked the coplanar limitation. This decision evidences no "misunderstanding," and Pannu has not successfully shown why only one portion of the supporting elements is properly considered.

We have considered both Iolab's and Pannu's remaining arguments, and find all of their arguments unpersuasive. The district court's procedural rulings were not an abuse of discretion. The jury's verdict was not against the great weight of the evidence. Its findings that two of the accused lens types infringed and that the other two did not infringe were amply supported by the evidence of record.

## CONCLUSION

The district court properly construed the disputed claim terms and did not err in denying the post-trial motions challenging the infringement and non-infringement verdicts. However, the court did err by granting JMOL on the issue of inventorship. Iolab introduced sufficient evidence on which a reasonable jury could have found clear and convincing evidence that Link is a co-inventor. On such a finding and absent correction, the patent would be rendered invalid under section 102(f). Accordingly, we vacate the judgment in favor of Pannu and remand for a determination of the inventorship question and any related issues in a manner not inconsistent with this opinion.

*VACATED and REMANDED.*

## COSTS

Each party will bear its own costs.