**OREGON HEALTH & SCIENCE UNIVERSITY, Plaintiff,**

v.

**VERTEX PHARMACEUTICALS, INC., Defendant.**

No. CIV.01–1272–HU.

United States District Court, D. Oregon.

Nov. 8, 2002.

Robert D. Newell, James D. Zupancic, Patricia L. McGuire, Davis Wright Tremaine L.L.P., Portland, for Plaintiff.

David W. Axelrod, Denise M. Graves, Schwabe, Williamson & Wyatt P.C., Portland, James F. Haley, Jr., Jeanne C. Curtis, Robert B. Wilson, Elinor K. Shin, Gail A. Katz, Fish & Neave, New York, NY, for Defendant.

## OPINION AND ORDER

HAGGERTY, Chief Judge.

On September 3, 2002, Judge Hubel filed his Findings and Recommendation that defendant's motion for judgment on the pleadings be granted in part and denied in part (doc. # 61). The matter is now before the court pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b). Defendant has filed timely objections. When either party objects to any portion of a Magistrate Judge's Findings and Recommendation on a dispositive motion, the district court must make a *de novo* determination of that portion of the Magistrate Judge's report. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.,* 656 F.2d 1309, 1313 (9th Cir.1981). For the reasons stated below, the court adopts in part and rejects in part Judge Hubel's Findings and Recommendation, Defendant's motion for judgment on the pleadings (doc. # 20) is GRANTED.

## BACKGROUND

The facts of this case are described in the Findings and Recommendation and need not be repeated at length. Plaintiff's first claim for relief under 35 U.S.C. § 256 seeks to add its research scientist, Dr. Gold, as an inventor on defendant's patent U.S. 6,037,370 (the '370 patent). The '370 patent application claimed the "neurotrophic" uses of various chemical compounds called "binders." A chemical is neurotrophic if it can stimulate nerve growth. "Binders" are compounds able to bind to a chemical called FKBP 12. This binding action with FKBP12 was once thought necessary for neurotrophic effects. "Non-binders" are chemicals that do not bind to FKBP12.

Defendant first filed the '370 patent application on June 8, 1995. In June 1996, pursuant to an agreement between plaintiff and defendant, Dr. Gold tested some of defendant's pharmaceutical compounds, including binders and non-binders. During these tests, Dr. Gold discovered that one of the non-binders exhibited neurotrophic effects previously believed to be characteristic only of binders. This discovery was communicated to defendant, who subsequently amended claims one through six of the '370 patent application to remove language that restricted neurotrophic activity

to binders. Plaintiff alleges that these amendments, which disassociated neurotrophic activity from binders, now include Dr. Gold's invention that non-binders can be neurotrophic. Dr. Gold is not named as an inventor on the '370 patent, so plaintiff brings this action under 35 U.S.C. § 256 to add Dr. Gold as a joint inventor.

In his Findings and Recommendation, Judge Hubel recommended that defendant's motion for judgment on the pleadings be granted in part and denied in part. The Magistrate Judge recommended granting judgment against plaintiff's second claim, which alleges inequitable conduct/fraudulent procurement. Plaintiff, having already agreed to dismiss the claim voluntarily, raises no objection to judgment on this claim in favor of defendant.

As to plaintiff's claim under 35 U.S.C. § 256 to add Dr. Gold as an inventor on the '370 patent, Judge Hubel recommended that defendant's motion for judgment on the pleadings be denied. Judge Hubel concluded that after discovery plaintiff might be able to produce evidence sufficient to show that Dr. Gold was a co-inventor and, if so, the court could order him added to the patent pursuant to Section 256. *See* Findings and Recommendation at 13 and 16.

Defendant objects to the Findings and Recommendation on two grounds. Defendant argues that: (1) as a matter of law, Dr. Gold cannot be a co-inventor of the '370 patent because Dr. Gold did not make his contribution to the invention until one year after the patent application was filed; and (2) plaintiff is improperly seeking a judgment on the patent's validity by attempting to add Dr. Gold as an inventor on the '370 patent.

### DISCUSSION

■ A patent is invalid if more or less than the true inventors are named. *Trovan, Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292, 1301 (Fed.Cir.2002). To save a patent from invalidity for the failure to name a joint inventor or a correct inventor, 35 U.S.C. § 256 provides that if the true inventors are not named on a patent, the patent may be corrected to reflect these true inventors. *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed.Cir.1998). Plaintiff alleges that by amending claims one through six of the '370 patent application, defendant broadened the scope of the patent to encompass Dr. Gold's invention that non-binders can be neurotrophic. While Dr. Gold is not the inventor of the subject matter *as originally claimed*, plaintiff believes that he should be named as a co-inventor on the patent *as issued*. Plaintiff seeks to invoke Section 256 in order to make this "correction."

The assertion that Dr. Gold should be named as the inventor of the patent—as issued—rests on the premise that defendant impermissibly amended its patent to add new matter to claims one through six, in violation of 35 U.S.C. § 132 ("No amendment shall introduce new matter into the disclosure of the invention."). As plaintiff alleges, "[D]efendant amended the claims to add subject matter not found in the original application ...." Plaintiff's Response to Defendant's Objections to the Findings and Recommendation at 2.

Defendant objects to a claim of invalidity being raised through a Section 256 action to correct inventorship, arguing that a challenge to the validity of a patent may be asserted only as a defense to an infringement suit. *See In re Lockwood*, 50 F.3d 966, 974 n. 8 (Fed.Cir.1995), *vacated*, 515 U.S. 1182, 116 S.Ct. 29, 132 L.Ed.2d 911 (1995). Plaintiff responds that it is not attacking the validity of the patent, but merely seeks to have Dr. Gold's contribution to the invention claimed in the '370 patent recognized by adding Dr. Gold's name to the patent. Moreover, plaintiff contends that there is no requirement that

a patent corrected in a Section 256 action be valid in all other respects. *See Stark v. Advanced Magnetics, Inc.*, 119 F.3d 1551, 1554 (Fed.Cir.1997) (allowing plaintiff's Section 256 claim to proceed despite the fact that the patent could ultimately be declared unenforceable due to inequitable conduct).

While it is true that plaintiff is not arguing that the '370 patent should be declared invalid, a decision that Dr. Gold should be added to the '370 patent would require a preliminary finding that the patent is invalid. This is because both conception and reduction to practice are deemed to occur no later than the filing date of the patent application. *Hyatt v. Boone*, 146 F.3d 1348, 1352 (Fed.Cir.1998). The new matter prohibition of 35 U.S.C. § 132 serves to ensure that the patent applicant was in full possession of the claimed subject matter on the application filing date. *TurboCare Div. of Demag Delaval Turbomachinery Corp. v. General Elec.*, 264 F.3d 1111, 1118 (Fed.Cir.2001). "Because the filing date is so important in determining patent rights, it is essential that there be no question that, *at the time an application for patent is filed,* the invention claimed therein is fully capable of being reduced to practice ...." *In re Argoudelis*, 58 C.C.P.A. 769, 434 F.2d 1390, 1395 (Fed.Cir.1970) (Baldwin, J., concurring) (emphasis in original).

■ Dr. Gold did not make his discovery that non-binders could be neurotrophic until one year after defendant filed the '370 patent application. To add Dr. Gold to the patent would necessarily require a finding that defendant was not in possession of the claimed subject matter at the time it filed its application or, in other words, that the patent is invalid. The '370 patent may indeed be invalid in this sense, but, contrary to the Findings and Recommendation, it is impermissible to declare it invalid in an action brought under Section 256. Congress has conferred no jurisdiction on the federal courts to adjudicate a patent's validity in a Section 256 action to correct inventorship. *Cf.* 35 U.S.C. § 282 (allowing parties to assert invalidity as a defense to an infringement action).

■ ▪ *Stark v. Advanced Magnetics, Inc.* is distinguishable. In that case, the Federal Circuit merely observed that a patent corrected pursuant to Section 256 may also be declared invalid in some hypothetical future action but that any potential invalidity was irrelevant to the claim of inventorship by Dr. Stark. *See Stark*, 119 F.3d at 1555. In contrast, adding Dr. Gold in this instance would mean that the patent is necessarily invalid. Otherwise, the contention that Dr. Gold is a co-inventor of the claimed subject matter on an application filed one year before his collaboration would be nonsensical. As the Federal Circuit explained in *Credle v. Bond:*

> [W]here the sets of dates alleged define distinct, non-overlapping periods, the allegation that the inventors are joint is facially inconsistent with the two distinct periods, because a person who first conceived and first reduced the subject matter of the invention to practice cannot, under the law, be a joint inventor with a person who allegedly did not even conceive the invention until after the former's reduction to practice. Collaboration under such circumstances simply is not possible.

25 F.3d 1566, 1574 (Fed.Cir.1994). Unless the '370 patent is invalid because defendant impermissibly broadened the scope of its original application, it is impossible for Dr. Gold to have collaborated on the subject matter of this patent filed one year before his involvement. Plaintiff may not assert that a patent is invalid in an action to correct the named inventors under Section 256. Accordingly, this court finds that, as a matter of law, Dr. Gold cannot be named as a joint inventor under Section 256.

## CONCLUSION

The Findings and Recommendations (doc. # 61) is adopted in part and rejected in part. With regard to plaintiff's claim of inequitable conduct/fraudulent conduct, the recommendation for judgment in favor of defendant is adopted. However, the recommendation that defendant's motion for judgment on the pleadings be denied is rejected. The motion for judgment on the pleadings (doc. # 20) is GRANTED.

**IT IS SO ORDERED.**

## FINDINGS AND RECOMMENDATION

HUBEL, United States Magistrate Judge.

This matter is before the court on defendant's motion for judgment on the pleadings (# 20). For the following reasons, defendant's motion should be granted in part and denied in part.

### BACKGROUND

Dr. Gold is a research scientist at OHSU.[1] On July 13, 1989, Dr. Gold assigned "all right, title, and interest in any writing, or in any invention, design, or formula whether or not patentable" to OHSU. Dr. Gold, a neuroscientist specializing in nerve growth and regeneration, has developed a model system for determining the neurotrophic effect of compounds and drugs ("Gold neurotrophic experimental model").

In 1992, Dr. Gold discovered that FK506, a known immunosuppressant compound, stimulated nerve growth (i.e. is neurotrophic). Dr. Gold published his finding at the Society for Neuroscience meeting in November, 1993. Dr. Gold was the first scientist to publish the finding that FK506 is neurotrophic.

In 1994, Guilford Pharmaceuticals, Inc. ("Guilford") published results from its laboratory showing the FK506 is neurotrophic. In 1994, the conventional understanding in the field was that the immunosuppressive and neurotrophic effects of FK506, and its immunosuppressive analogs, were mediated (i.e accomplished by the aid of an intervening medium) by the binding of FK506 with its binding protein, FKBP12.[2] On June 7, 1995, Guilford filed the first patent applications claiming neurotrophic uses of binders.[3] On June 8, 1995, defendant filed its first patent application claiming neurotrophic uses of binders, U.S. 08/486,004 (the "486,004 application"). The specifications of the patent application state that "[t]he neurotrophic activity of the FKBP12 binding compounds of this invention *is directly related to their affinity for FKBP12 ...*" First Amended Complaint ¶ 12 (emphasis in First Amended Complaint, added to original). Plaintiff alleges that the binding limitation "with affinity for FKBP12" is a material limitation of the claims in the 486,004 application.

On May 10, 1996, Dr. Armistead, an employee of defendant, the sole inventor on the 486,004 application, and a co-founder and shareholder in Vertex, contacted Dr. Gold to invite Dr. Gold to do experiments utilizing his expertise and the Gold neurotrophic experimental model to determine whether various Vertex compounds had neurotrophic activity.

Pursuant to Dr. Armistead's contact with Dr. Gold, in June 1996, plaintiff and defendant entered into a written Research

---

1. Facts are taken from plaintiff's first amended complaint.

2. Compounds that bind to FKBP12 are referred to in the pleadings as binders. FK506 and its immunosuppressive analogs are binders. Compounds that do not bind to FKBP12 are referred to in the pleadings as non-binders.

3. Guilford's applications issued as patents in 1997.

Agreement in which defendant agreed to sponsor Dr. Gold's research in consideration for $28,654.00. The agreement stated in pertinent part:

> UNIVERSITY [OHSU] shall retain all right, title, and interest in and to any such inventions and improvements made solely by its employees, including without limitation any patent applications thereon and patents resulting therefrom. Joint inventions shall be jointly owned by UNIVERSITY [OHSU] and SPONSOR [Vertex].

First Amended Complaint ¶ 18.

On June 13, 1996, Dr. Armistead sent Dr. Gold a panel of five blinded compounds, one of which was a non-binder ("panel 1"). According to the state of the science at the time, only binders were believed to be neurotrophic. Dr. Armistead did not communicate to Dr. Gold any belief or expectation that the non-binder could be neurotrophic. Based on his previous research, Dr. Gold recognized that the three blinded compounds coded A, B, and C were FK506, rapamycin, and cyclosporin, respectively. The other two compounds were coded V–9256 and V–12518.

Dr. Gold conducted experiment 1 on the panel and determined that four of the five compounds were expressing neurotrophic effect. On June 21, 1996, Dr. Gold recognized that the one compound in panel 1 that failed to produce a neurotrophic effect was cyclosporin. Because the four compounds other than cyclosporin were neurotrophic and knowing that one of the remaining compounds was a non-binder, Dr. Gold realized that the non-binder was unexpectedly expressing a neurotrophic effect. Dr. Gold realized that, contrary to current understanding in the field, non-binders also could be neurotrophic.

Dr. Gold called Dr. Armistead on June 21, 1996, and communicated the unexpected results of experiment 1. Dr. Armistead expressed surprise and excitement at the results. On June 24, 1996, Dr. Gold called Dr. Armistead after a second round of testing to confirm the discovery that the four compounds in panel 1 other than cyclosporin were expressing neurotrophic activity. Dr. Armistead again became excited and confirmed that one of the four neurotrophic compounds was a non-binder.

On July 18, 1996, Dr. Armistead sent Dr. Gold a second expanded panel of compounds including multiple binders and non-binders ("panel 2") in an effort to determine if more than one non-binder could be neurotrophic. Dr. Gold conducted experiment 2 using panel 2 compounds and confirmed that non-binders could be neurotrophic and expanded the finding to a class of non-binders.

On September 5, 1996, Dr. Gold communicated the results of experiment 2 to Dr. Armistead. Dr. Gold subsequently confirmed his findings from experiments 1 and 2 through statistical analyses of quantitative results obtained by digitizing photographs of the cell cultures and sciatic nerve preparations. Plaintiff alleges that the invention that non-binders can be neurotrophic was conceived and reduced to practice in the Gold experiments and that Dr. Gold's contribution to conception was substantial.

On November 13, 1996, Vertex applied for three patents (the "Triad applications") claiming methods and pharmaceutical compositions for multiple genera of compounds that include non-binders that are neurotrophic. Plaintiff alleges that these are the first applications filed by defendant that do not teach in the specifications that neurotrophic activity is "directly related" to FKBP12 bindings and do not include the binding limitation in any of the claims.[4]

4. These applications issued as patents in 1998.

Dr. Gold is not named as an inventor on the Triad patents.

On November 17, 1997, defendant amended the 486,004 application filed in 1995 to remove the binding limitation from six claims of that application. Defendant removed the language "with affinity for FKBP12" from claims 1–6 of the application disassociating neurotrophic activity from FKBP12 binding.[5] By removing the binding limitation, defendant's '370 patent includes Dr. Gold's invention that non-binders can be neurotrophic, although Dr. Armistead is the sole inventor named in the '370 patent.

Plaintiff alleges that defendant's deletion of the binding limitation in the 004 application was not a responsive amendment to an office action by the United States Patent and Trademark Office ("PTO"). Plaintiff further alleges that defendant hid its unresponsive amendment by not using standard editorial methods to indicate the deletion of the binding limitation.

In May 1998, defendant applied for another patent stating that "[s]urprisingly, it is now known that binding is not necessary for neuronal activity." First Amended Complaint ¶ 35. This application issued as patent U.S. 6,268,384 (the "'384 patent") on July 31, 2001. Plaintiff alleges that the '384 patent includes Dr. Gold's invention that non-binders can be neurotrophic. Dr. Gold is not named as an inventor on the '384 patent.

Plaintiff brought this action on August 23, 2001, alleging nonjoinder of inventor under 35 U.S.C. § 256. Plaintiff filed an amended complaint on December 12, 2001, alleging nonjoinder of inventor under 35 U.S.C. § 256 as well as fraudulent procurement/inequitable conduct, fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, conversion and unjust enrichment contending that defendant wrongfully failed to include Dr. Gold as an inventor on the '370,- '384 and Triad patents.

Defendant filed a motion for judgment on the pleadings seeking a judgment in its favor on plaintiff's claim for nonjoinder of Dr. Gold with respect to the '370 patent and seeking judgment in its favor with respect to all of the patents on plaintiff's claim for fraudulent procurement/inequitable conduct. Plaintiff objects. This matter is now properly before the court.

### STANDARD

Rule 12(c) allows for a motion of judgment on the pleadings after the pleadings are closed, but within such time as not to delay the trial. Fed.R.Civ.P. 12(c). If matters outside the pleadings are presented to and not excluded by the court, the motion is to be treated as one for summary judgment. *Id.*

Judgment on the pleadings is proper when there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Bagley v. CMC Real Estate Corp.*, 923 F.2d 758, 760 (9th Cir.1991). All allegations of fact by the party opposing the motion are accepted as true and are construed in the light most favorable to that party. *Id.* A motion for judgment on the pleadings may not be based on evidence or allegations outside of the pleadings, and allegations in the non-moving party's pleadings should be accepted as true for purposes of deciding the motion. *Buckey v. County of Los Angeles*, 968 F.2d 791, 794 (9th Cir.1992).

---

**5.** This application issued as patent U.S. 6,037,370 (the "'370 patent") on March 14, 2000.

## DISCUSSION

### I. Inequitable Conduct/Fraudulent Procurement

Defendant alleges that plaintiff lacks standing to assert claims of inequitable conduct or fraudulent procurement in connection with the prosecution of the patents at issue because these claims are available only as defenses to infringement claims and defendant has not alleged any infringement by plaintiff of the patents at issue. *See* 35 U.S.C. § 282 (challenge to the validity of a patent is a defense of a claim of infringement).

Plaintiff states in its response that it has agreed to voluntarily dismiss without prejudice its second claim for relief, thereby mooting defendant's motion with respect to this claim. Plaintiff has not moved to voluntarily dismiss this claim as of the time of this finding and recommendation, therefore based on plaintiff's representation in its response, defendant's motion for judgment on the pleading should be granted with respect to plaintiff's claim for inequitable conduct/fraudulent procurement.

### II. Inventorship

Defendant makes two arguments with respect to plaintiff's claim under 35 U.S.C. § 256 to add Dr. Gold as an inventor on patent '370: (1) Dr. Gold cannot be a co-inventor on the '370 patent because the application was filed nearly a year before Dr. Gold conducted his experiments; and (2) plaintiff's claim seeking to add Dr. Gold to the patent is actually the patent infringement defense of invalidity in disguise as an affirmative claim for relief, however, because defendant has not alleged infringement, plaintiff has no standing to raise the issue of invalidity. The court will address defendant's arguments in turn.

### A. Co-inventor Status

"Patent issuance creates a presumption that the named inventors are the true and only inventors." *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460 (Fed.Cir.1998) (citations omitted). A patented invention may be the work of joint inventors. 35 U.S.C. § 116.

Conception is the "touchstone of inventorship" therefore, each joint inventor "must generally contribute to the conception of the invention." *Id.* (citations omitted). "Nevertheless, for the conception of a joint invention, each of the joint inventors 'need not make the same type or amount of contribution' to the invention." *Ethicon*, 135 F.3d at 1460 (quoting 35 U.S.C. § 116). Each inventor need only "perform ... a part of the task which produces the invention." *Id.* However, an individual does not qualify as a joint inventor "by merely assisting the actual inventor after conception of the claimed invention." *Id.* (citations omitted). "One who simply provides the inventor with well-known principles or explains the state of the art without even having a firm and definite idea of the claimed combination as a whole does not qualify as a joint inventor." *Id.* (quotations omitted). Finally, "a co-inventor need not make a contribution to every claim of a patent. A contribution to one claim is enough." *Ethicon*, 135 F.3d at 1460 (citations omitted).

Once an inventor conceives of an invention, he must reduce it to practice, i.e. actually perform or carry out the conceived invention. The reduction to practice, however, does not determine inventorship. *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed.Cir.1994) ("[A]n inventor need not know that his invention will work for conception to be complete. He need only show that he had the idea; the discovery that an invention actually works is part of its reduction to practice.")

Both conception and reduction to practice are deemed to occur no later than the

filing date of the patent application because conception must occur before the application can accurately describe the invention and reduction to practice must occur so the application can teach how to make and use the invention. *Hyatt v. Boone*, 146 F.3d 1348, 1352 (Fed.Cir.1998).

Although the court agrees that issuance of a patent creates the presumption that the named inventor is the true and only inventor, that presumption can be overcome by clear and convincing evidence. *Ethicon*, 135 F.3d at 1461. Patent law makes clear that a "person shall be entitled to a patent unless he did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f). "[T]his subsection mandates that a patent accurately list the correct inventors of a claimed invention." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349 (Fed.Cir.1998). This requirement is necessary to the issuance of a patent even if amendments to the application take place before the patent issues. *See* 35 U.S.C. § 112; *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir.1991) ("The purpose of the 'written description' requirement is broader than to merely explain how to make and use; the applicant must also convey ... that as of the filing date sought, he or she was in possession of the invention.").

Furthermore, patent law is clear that "[n]o amendment [to an application] shall introduce new matter into the disclosure of the invention." 35 U.S.C. § 132(a). Plaintiff alleges that defendant violated a combination of § 112 and § 132 by adding language to the claims of the '370 so as to broaden the patent causing it to include Dr. Gold's invention.

Defendant argues that because it applied for the '370 patent on June 8, 1995, but Dr. Gold did not perform his experiments until June of 1996, Dr. Gold cannot possibly be a joint inventor on the '370 patent. In support of its contention, defendant cites *Credle v. Bond*, 25 F.3d 1566 (Fed.Cir.1994).

In *Credle*, the court held that conception and reduction to practice of the subject matter of the invention will prevent co-ownership by an individual who did not conceive of the invention until after the prior reduction to practice. *Id.* at 1574. As the Federal Circuit explained:

> a person who first conceived and first reduced the subject matter of the invention to practice cannot, under the law, be a joint inventor with a person who allegedly did not even conceive the invention until after the former's reduction to practice. Collaboration under such circumstances simply is not possible.

*Id.* at 1574.

However, the facts of *Credle* are distinguishable from the facts of this case. Here, plaintiff does not allege that Dr. Gold conceived of the invention of non-binders being neurotrophic after Dr. Armistead conceived and reduced to practice that idea. Rather, plaintiff alleges that when defendant filed its application for the '370 patent in June, 1995, the application did not describe or encompass the idea that non-binders could be neurotrophic because no one had conceived of that idea or invention in June 1995. Plaintiff contends that Dr. Gold conceived the invention during his experiments in June through September 1996 and defendant improperly, and in violation of § 132, amended its patent in November 1996 to include new matter, a "new concept", that non-binders could be neurotrophic, and that the amendment improperly failed to include Dr. Gold as a co-inventor of the concept. Because the amendment occurred after Dr. Gold conceived of the invention, the application as amended could and should include the co-inventors of Dr. Armistead and Dr. Gold.

Pursuant to *Ethicon,* the presumption that Dr. Armistead is the true and only inventor of the '370 patent due to the issuance of patent '370 without Dr. Gold may be overcome by clear and convincing evidence if plaintiff is allowed to continue with this action.

I find plaintiff's argument compelling with respect to the issue of overcoming the presumption that the named inventor on the patent is the only true inventor. After discovery, plaintiff may be able to produce evidence sufficient to overcome this presumption. Accepting plaintiff's allegations as true at this stage of the proceedings, I find defendant's argument regarding the presumption insufficient as a basis to grant the motion for judgment on the pleadings.

### B. Affirmative Defense

Defendant contends that plaintiff's allegations regarding defendant's alleged amendment to add new matters in violation of 36 U.S.C. § 132 are irrelevant to the issue of whether Dr. Gold should be named as a co-inventor on the '370 patent. Rather, these allegations are relevant only to the validity of the '370 patent and plaintiff has no standing to challenge the validity of the patent because defendant has not threatened an infringement action against plaintiff. Therefore, defendant contends, plaintiff is attempting to use validity, which is only allowed as an affirmative defense, as a cause of action, which is not contemplated under the statute, i.e. plaintiff may not use validity as a sword, only as a shield.

In *Pannu,* the Federal Circuit provided a helpful analysis of the interaction of 35 U.S.C. § 256 and the issue of invalidity. The court noted that § 102(f) "mandates that a patent accurately list the correct inventors of a claimed invention." *Pannu,* 155 F.3d at 1349. Therefore, generally, "if nonjoinder of an actual inventor is proved by clear and convincing evidence, a patent

is rendered invalid." *Id.* The court noted that prior to the Patent Act of 1952, nonjoinder of an actual inventor would render a patent invalid and that nothing in the language or the legislative history of § 102(f) suggests that Congress intended that section to change the existing law. *Id.* at 1349. However, "in cases of misjoinder and nonjoinder the operation of section 102(f) is ameliorated by section 256." *Pannu,* 155 F.3d at 1350.

Section 256 provides:

Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error. The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

35 U.S.C. § 256. As the court in *Pannu* explained, section 256 is a savings provision. "If a patentee demonstrates that inventorship can be corrected as provided for in section 256, a district court must order correction of the patent, thus saving it from being rendered invalid." *Pannu,* 155 F.3d at 1350. Therefore, the court concluded

When a party asserts invalidity under § 102(f) due to nonjoinder, a district court should first determine whether there exists clear and convincing proof that the alleged unnamed inventor was

in fact a co-inventor. Upon such a finding of incorrect inventorship, a patentee may invoke section 256 to save the patent from invalidity. Accordingly, the patentee must then be given an opportunity to correct inventorship pursuant to that section.

*Id.* The court further noted that "[n]on-joinder may be corrected 'on notice and hearing of all parties concerned' and upon a showing that the error occurred without any deceptive intent on the part of the unnamed inventor." *Id.* (citing 35 U.S.C. § 256; *Stark v. Advanced Magnetics, Inc.,* 119 F.3d 1551, 1555, 43 U.S.P.Q.2d 1321, 1324 (Fed.Cir.1997)). Finally, the court concluded that "[i]f the inventorship is successfully corrected, section 102(f) will not render the patent invalid. On the other hand, if the patentee does not claim relief under the statute and a party asserting invalidity proves incorrect inventorship, the court should hold the patent invalid for failure to comply with section 102(f)." *Pannu,* 155 F.3d at 1350–51.

In this case, plaintiff seeks relief under § 256. Therefore, the court must first examine whether there is "clear and convincing proof that [Dr. Gold] was in fact a co-inventor." *Pannu,* 155 F.3d at 1350. If the court makes such a finding, plaintiff's invocation of § 256 will save the patent from invalidity. *Id.* Therefore, defendant's contention that plaintiff has no standing because plaintiff is, in essence, alleging invalidity, is unconvincing. Rather, it appears that the court must examine the evidence and conclude whether plaintiff produces clear and convincing evidence sufficient to overcome the presumption that Dr. Armistead is the only inventor.

If the court determines that plaintiff has produced clear and convincing evidence that Dr. Gold is a co-inventor and without deceptive intent, the court may order Dr. Gold added to the patent without invalidating the patent. If the court determines

that plaintiff has not produced clear and convincing evidence, the court must find that plaintiff has not met the requirements of § 256 and it does not apply. At that point, the court should dismiss any claim under § 256 by plaintiff or Dr. Gold.

However, at this phase of the proceedings, the court has no evidence outside the pleadings before it. Because *Pannu* requires the court to examine the proof submitted by plaintiff on a § 256 claim, the court should deny defendant's motion for judgment on the pleadings with respect to the issue of inventorship at this time. Defendant may re-raise this issue at the summary judgment stage, at which time, the court will examine the evidence before it and make a determination as required by *Pannu* regarding the applicability of § 256 to this case.

### RECOMMENDATION

Defendant's motion for judgment on the pleadings (# 20) should be granted in part and denied in part.

### SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due September 17, 2002. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due October 1, 2002, and the review of the Findings and Recommendation will go under advisement on that date.

Sept. 3, 2002.